J. Henk Taylor (016321)
**RYAN RAPP & UNDERWOOD, P.L.C.**
3200 North Central Avenue, Suite 2250
Phoenix, Arizona 85012
Telephone: (602) 280-1000
Facsimile: (602) 265-1495
E-Mail: htaylor@rrulaw.com

Jeffrey M. Eilender (*pro hac vice to be submitted*)
Bradley J. Nash (*pro hac vice to be submitted*)
Joshua Wurtzel (*pro hac vice to be submitted*)
**SCHLAM STONE & DOLAN LLP**
26 Broadway
New York, New York 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
E-Mail: jeilender@schlamstone.com
E-Mail: bnash@schlamstone.com
E-Mail: jwurtzel@schlamstone.com

*Attorneys for Plaintiff Resource Recovery Corporation*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Resource Recovery Corporation, | Case No.: _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Inductance Energy Corporation; Wyo Tech Investment Group, LLC; RDX Technologies Corporation; William J. Hinz; Judie Hinz; Anthony Ker; Yasmin Ker; Richard Carrigan; and Melissa Carrigan, | |
| Defendants. | |

1
2
3
4
5
6
7

Plaintiff Resource Recovery Corporation ("RRC"), by and through its counsel, asserts the following causes of action against Defendants Inductance Energy Corporation ("Inductance"), Wyo Tech Investment Group, LLC ("Wyo Tech"), RDX Technologies Corporation ("RDX"), William J. Hinz ("Hinz"), Anthony Ker ("Ker"), Richard Carrigan ("Carrigan") (collectively, "Defendants"), and the spouses of Hinz, Ker, and Carrigan, and alleges as follows.[1]

8

## NATURE OF ACTION

9
10
11
12
13
14
15
16
17
18

1.    This is an action to enforce a settlement agreement Defendants entered into with RRC and the CWT Parties to resolve several lawsuits pending in this District and in other courts, in exchange for a payment of $2.5 million by the Defendants to RRC and the CWT Parties. Under the terms of the settlement agreement, all the Defendants are jointly and severally liable for the $2.5 million payment. But despite RRC and the CWT Parties' performance of all their obligations, Defendants have unaccountably repudiated the validity of the agreement and refused to pay. Thus, RRC now sues for this settlement payment and specific enforcement of the Defendants' nonmonetary obligations under the agreement.

19
20
21
22
23

2.    On January 16, 2020, all the parties to this lawsuit executed a binding term sheet (the "Term Sheet") following a full-day mediation before the Honorable Barry C. Schneider in Phoenix, Arizona. And while the Term Sheet contemplated that the parties would execute a follow-up settlement agreement that incorporated the terms of the Term

24
25
26
27
28

---

[1] This action is related to the interpleader action captioned *Wells Fargo Bank, N.A. v. Wyo Tech Investment Group, LLC, et al.*, Case No. 17-cv-4140-DWL (the "Interpleader Action"), which is pending in this District before the Honorable Dominic W. Lanza, and the action captioned *Resource Recovery Corp. v. Inductance Energy Corp., et al.*, Case No. 19-cv-5255-MTL (the "Fraudulent-Transfer Action"), which is pending in this District before the Honorable Michael T. Liburdi but is the subject of a motion to transfer to Judge Lanza as related to the Interpleader Action.

Sheet, the parties all agreed that if they could not agree on a mutually acceptable "final settlement agreement," the Term Sheet was binding on its own. This was because the Term Sheet (three single-spaced pages) included all the essential terms of the settlement, and after years of multi-jurisdictional litigation, the parties were eager to preserve a deal that had taken so long to achieve. So, while in an ideal world, a formal settlement agreement with all the usual bells and whistles would have been preferable, executing a follow-up, formal settlement agreement was expressly agreed by the parties in the Term Sheet to be a mere formality that was not necessary to effectuate what had already been agreed to by everyone.

3.      The desire for each party signing the Term Sheet to be finally and irrevocably bound to the settlement as of its signing on January 16, 2020 was unambiguously demonstrated immediately above their signatures, where it was written: ***"By signing this document, the parties agree to be bound by the terms set forth herein."*** And reiterating this obligation to be bound by the Term Sheet, several of the Defendants have since also represented to courts in lawsuits pending in this District that the Term Sheet was "binding."

4.      But despite the Term Sheet's unambiguous language, and their actions ratifying it (explained below), Defendants have refused to sign a follow-up settlement agreement that incorporates all the terms of the Term Sheet. Instead, Defendants have disclaimed the payment term, insisting that only RDX—a defunct company with no meaningful assets, which has twice (unsuccessfully) filed for Chapter 11 in the last several years, and against which RRC already has an unsatisfied judgment worth over $9 million—be the only one of them liable for the $2.5 million payment. This contradicts the Term Sheet, since in it, each Defendant named in this action (not just RDX) agreed to be "bound by the terms set forth herein"—including the payment term. And so by seeking to

modify the Term Sheet in any follow-up agreement to make only RDX liable for this payment shows that Defendants likely have no intent to make this payment, since they know that RRC and the CWT Parties will have no adequate recourse against RDX if the payment is not made.

5.     RRC and the CWT Parties have been chasing some of these Defendants for years to collect on their prior judgment against RDX and Dennis Danzik ("Danzik"), which is now worth over $9 million. And all the Defendants other than Hinz and his companies have claimed at some time to have no meaningful assets. Thus, RRC and the CWT Parties agreed to enter into the Term Sheet only because Hinz is, as the *Wall Street Journal* described him last year, an "ultrahigh-net-worth" businessman, and would be responsible for funding or authorizing the settlement. Without Hinz, there would have been no point to an agreement, and his disclaiming responsibility for an agreement that he orchestrated is a bait and switch.

6.     In this regard, Hinz was a party to the Term Sheet in his personal capacity. This is established by the fact that he signed the Term Sheet twice—once for Wyo Tech and then a second time above a signature line that listed his name in no representative capacity, thus objectively manifesting an intent to be personally bound. Thus, Hinz's agreement to be personally bound by the Term Sheet was critical in ensuring that this $2.5 million payment would be made.

7.     Moreover, under the Term Sheet, Hinz was ***personally*** to receive RRC's over-$9 million judgment against Danzik, a $17 million note, a personal release, and releases and discontinuances of litigation against his companies, Wyo Tech and Inductance. So it made perfect sense, and was essential to RRC's and the CWT Parties' execution of the Term Sheet, that Hinz be personally bound by the Term Sheet—

especially since Defendants' counsel previously represented that Hinz and his companies would be the ***"only source"*** of a settlement payment.

8.      Finally, it was counsel for Hinz and his companies, Inductance and Wyo Tech, who solely drafted the Term Sheet. There is no ambiguity concerning whether the Term Sheet is binding or who is bound by it, since the Term Sheet says it is binding and was signed by Defendants. But if there were any ambiguity, it would be construed against Defendants, including Hinz.

9.      Since mid-March when Defendants stated their refusal to execute a follow-up agreement that was consistent with—and not a radical modification of—the Term Sheet, RRC and the CWT Parties' counsel sent demands for payment of the $2.5 million under the Term Sheet to Defendants, and also sent Defendants all the executed releases, stipulations, and assignments that they were required to execute under the Term Sheet. Thus, RRC and the CWT Parties have fully performed under the Term Sheet. But Defendants have not, and their failure to perform—including payment of the $2.5 million—is a breach of the Term Sheet.

10.     Further, while Defendants have recently claimed the Term Sheet is not a binding agreement—a position that contradicts the Term Sheet's plain language and their own representations to courts in this District—Defendants have accepted some of the benefits of the Term Sheet already. Indeed, on February 28, 2020, in accordance with the Term Sheet, the CWT Parties and some of the Defendants executed a stipulation with prejudice dismissing one of the CWT Parties' pending lawsuits in this District—which was scheduled for trial in April 2020. And also in accordance with the Term Sheet, the CWT Parties and RRC's principals have assisted Defendants in their efforts to reach a settlement with GEM, a separate Danzik and RDX creditor, and Defendants have also

accepted this assistance (required by the Term Sheet) without reservation. So Defendants have ratified the Term Sheet, and cannot now claim that it was never binding.

11.     In this action, RRC seeks a judgment against all Defendants—jointly and severally—for the $2.5 million they agreed, but have refused, to pay; plus interest and attorneys' fees and disbursements incurred in bringing this action under A.R.S. §§ 12-341 and 12-341.01; plus a permanent injunction directing Defendants to specifically perform their obligations under the Term Sheet, including executing the releases, stipulations, and assignments attached as exhibits to this Complaint and dismissing the Canadian Action with prejudice; plus a declaratory judgment that the Term Sheet is a valid and binding contract, and that Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan are jointly and severally for any damages that RRC or the CWT Parties incur—including attorneys' fees and disbursements, and liability for a judgment—as a result of Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan's refusal to execute the releases required by, or dismiss RDX's Canadian lawsuit against the CWT Parties in accordance with, the Term Sheet.

## THE PARTIES

12.     Plaintiff RRC is a New York corporation, with its principal place of business in New York. RRC is an actual signatory, and thus a party to, the Term Sheet. RRC is also the holder of all the CWT Parties' rights under the Term Sheet.[2]

13.     Upon information and belief, Defendant Inductance is a Wyoming corporation, with its principal place of business in Maricopa County, Arizona.

_____

[2] References in this Complaint to the "CWT Parties" are to CWT Canada II Limited Partnership, Resource Recovery Corporation (the Delaware corporation, which is different from the Plaintiff here), and Jean Noelting, collectively. References in this Complaint to "RRC" are to the Plaintiff here, which is a New York corporation. As explained in footnote three below, however, references in the Term Sheet to the "CWT Parties" are to all four of CWT Canada II Limited Partnership, Resource Recovery Corporation (the Delaware corporation), Resource Recovery Corporation (the New York corporation, and the Plaintiff here), and Jean Noelting.

14.     Upon information and belief, Defendant Wyo Tech is a Wyoming limited liability company, with its principal place of business in Maricopa County, Arizona. For purposes of diversity jurisdiction, as a limited liability company, the citizenship of Wyo Tech is the citizenship of its members. Upon information and belief, none of Wyo Tech's members are citizens of New York.

15.     Upon information and belief, Defendant RDX, formerly known as Ridgeline Energy Services, Inc., is a Canadian corporation, with its principal place of business in Maricopa County, Arizona.

16.     Upon information and belief, Defendant Hinz is a natural person who is a citizen of Arizona. Also upon information and belief, Hinz is the CEO of and a substantial investor in Inductance and Wyo Tech.

17.     Defendant Judie Hinz is a natural person who is the wife of Hinz, and upon information and belief, is a citizen of Arizona.

18.     Defendant Hinz was, at all times, acting on behalf of, and for the benefit of, the marital community comprised of Defendants Hinz and Judie Hinz. The marital community of Defendants Hinz and Judie Hinz is thus liable for the acts and omissions of Hinz as alleged in this Complaint.

19.     Upon information and belief, Defendant Ker is a natural person who is a citizen of Canada. Also upon information and belief, Ker is an officer or employee of Inductance.

20.     Defendant Yasmin Ker is a natural person who is the wife of Ker, and upon information and belief, is a citizen of Canada.

21.     Defendant Ker was, at all times, acting on behalf of, and for the benefit of, the marital community comprised of Defendants Ker and Yasmin Ker. The marital

community of Defendants Ker and Yasmin Ker is thus liable for the acts and omissions of Ker as alleged in this Complaint.

22.     Upon information and belief, Defendant Carrigan is a natural person who is a citizen of Pennsylvania.

23.     Upon information and belief, Defendant Melissa Carrigan is a natural person who is the wife of Carrigan, and upon information and belief, is a citizen of Pennsylvania.

24.     Defendant Carrigan was, at all times, acting on behalf of, and for the benefit of, the marital community comprised of Defendants Carrigan and Melissa Carrigan. The marital community of Defendants Carrigan and Melissa Carrigan is thus liable for the acts and omissions of Carrigan as alleged in this Complaint.

25.     Defendants Judie Hinz, Yasmin Ker, and Melissa Carrigan are joined as Defendants in this action for the purpose of obtaining a judgment binding on their respective marital communities even though they are not parties to the Term Sheet.

## JURISDICTION AND VENUE

26.     This Court has personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(A) and Ariz. R. Civ. P. 4.1 and 4.2. Indeed, this action arises out Defendants' breach of a contract that they entered into in Arizona, which followed a mediation in Arizona and which resolved litigations pending in Arizona.

27.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1), because there is diversity of citizenship and the matter in controversy exceeds $75,000.

28.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to RRC's claims occurred in this District.

# FACTUAL ALLEGATIONS

### A.   The New York Court Enters Judgment Against Dennis Danzik and RDX for Defrauding the CWT Parties Out of Millions in Tax Credits

29.   In 2013, the CWT Parties sold a renewable energy company called Changing World Technologies, L.P. ("CWT") to RDX. Danzik was RDX's CEO. CWT was a holding company for and the sole member of a Delaware LLC called Renewable Environmental Solutions, LLC ("RES").

30.   As part of a federal subsidy program, RES was entitled to millions of dollars in tax credits (the "Tax Credits") from the United States Treasury. And since RES had no income, the United States Treasury affirmatively paid the Tax Credits to RES.

31.   Since RES earned millions of dollars of the Tax Credits before the CWT Parties sold RES's parent company, CWT, to RDX that had not yet been paid at the time of the sale (this was due to a late, retroactive renewal of the subsidy program), in the sale agreement between the CWT Parties and RDX, called the United Purchase Agreement (the "UPA"), the parties agreed that RDX—as the new owner of CWT, and thus RES— would remit these Tax Credits to the CWT Parties.

32.   But after receiving the Tax Credits that RES earned before the sale of CWT to RDX, and despite the parties' agreement that RDX would remit these Tax Credits to the CWT Parties, Danzik and RDX refused to remit over $5 million of Tax Credits to the CWT Parties. Instead, Danzik and RDX transferred the Tax Credits to Danzik himself, Danzik's wife Elizabeth, and companies that Danzik or his wife controlled, including Danzik Applied Sciences, LLC ("DAS").

33.   Specifically, Danzik did this by submitting bogus invoices to RDX from DAS and then paying DAS on those invoices. And Danzik also opened a secret bank account at Hometown Bank in Missouri in which he deposited $1.6 million of the Tax

Credits, kept this money off RDX's books and thus outside the purview of RDX's auditors, and then transferred this money to DAS and also to his wife.

34.    Danzik also stole additional assets from RDX, and transferred them to himself, his wife, and companies he controlled, including DAS—or he sold RDX's assets for parts, and then transferred the proceeds to himself, his wife, and companies he controlled, including DAS. Indeed, RDX—a once publicly traded company—now appears to be a shell, with almost all of its assets stripped and stolen by Danzik.

35.    Extensive litigation over this theft ensued in New York State court in the action captioned *GEM Holdco, LLC, et al. v. Changing World Technologies*, Index No. 650641/2013 (N.Y. Sup. Cr. N.Y. Cty.) (the "New York Action"). But on November 4, 2015, because of what the New York court held were "multiple extensive, willful and contumacious violations of this court's discovery orders," the New York court struck Danzik and RDX's defenses. And on August 4, 2016, the New York court granted the CWT Parties' motion for a default judgment.

36.    On September 7, 2016, the New York court entered judgment in favor of the CWT Parties and against Danzik and RDX for $7,033,491.13—which included the stolen Tax Credits, amounts due from a separate fraud involving another Danzik entity, Deja II, LLC, and interest.

**B.    The New York Court Holds Danzik and RDX in Criminal and Civil Contempt**

37.    On June 3, 2016, after a four-day hearing, the New York court also held Danzik and RDX in criminal and civil contempt for their violation of additional court orders. Specifically, the court held that Danzik (a) deliberately violated an attachment order directing him to return the stolen Tax Credits, and a TRO prohibiting RDX from transferring funds without court permission; and (b) committed a "fraud on the court" by

lying under oath, suborning perjury by another witness, and altering documents to hide his theft.

38.     In holding Danzik and RDX in contempt, the New York court held that the evidence at the contempt hearing showed "beyond a reasonable doubt, and certainly by clear and convincing evidence," that Danzik "stole all of the money" from the Tax Credits. The court also held that Danzik "admit[ted] his noncompliance with the Attachment Order," which required him to restore the stolen funds, and that his excuse for his noncompliance—that he lacked the funds to comply—was a "lie." Indeed, the New York court held that Danzik transferred the Tax Credits to "himself, his family members and their businesses," and then used that money to pay "personal expenses."

39.     The New York court also held that Danzik violated the TRO by creating a "sham" company, called M2R Licensing, LLC, for the purpose of "evading the court's orders and defrauding RDX's creditors." Indeed, the New York court held that "[a]fter having deposited the tax credit funds in a new, secret Hometown bank account, Danzik made sure to invoice all of RDX's clients with M2R invoices so revenue would be received by M2R instead of RDX," and changed invoices to existing RDX customers to come from M2R instead, *before* M2R was even formed." The purpose of this scheme was for RDX to then claim that it "had no funds to comply with the Attachment Order." But according to the New York court, "that excuse" was a "fraud on the court."

40.     Further, according to the New York court, Danzik is the "epitome of a recalcitrant, contemptuous, and incorrigible litigant," who "lie[d]," "deliberately did not disclose" relevant records, "coerced" a witness into "submitting false affidavits," and "perjured himself before a Canadian bankruptcy court."

41.     After holding Danzik and RDX in contempt, and giving them an opportunity to purge their contempt by restoring the stolen tax credits (which they did not do), the New York court issued a commitment order and an arrest warrant for Danzik.

**C.     RDX Sues the CWT Parties in Alberta, Canada**

42.     While the early stages of the New York Action were playing out between Danzik and RDX and the CWT Parties in New York, on August 26, 2014, RDX filed a suit in the Court of Queens Bench of Alberta in Alberta, Canada against, among others, the CWT Parties in an action captioned *RDX Technologies Corp. v. Appel, et al.*, Action No. 1401-09394 (Court of Queens Bench of Alberta) (the "Canadian Action"). In this suit, RDX (erroneously) alleged that the CWT Parties fraudulently induced it to enter into the UPA. These allegations are the same as the allegations RDX and Danzik made in the New York Action, which the court there rejected.

43.     The Canadian Action sat dormant for years as RDX unsuccessfully defended against the New York Action and resisted judgment enforcement in New York and Arizona.

44.     But over the last year, RDX has resumed pursuing this case. And because of procedural rules in Alberta, Canada allowing extensive discovery before a dispositive motion is decided, RDX has been able to cause the CWT Parties to expend significant resources before the Canadian court decides whether the judgment entered against RDX in the New York Action is binding in Canada. The Canadian court has not yet decided whether RDX's claims are precluded by the judgment in the New York Action, and so this case remains pending.

**D.    The CWT Parties Sue Ker and Carrigan for Their Role in Danzik and RDX's Theft of the Tax Credits**

45.    In an effort to expand the parties from which they could recover the stolen Tax Credits, on March 4, 2016, the CWT Parties sued Danzik's wife and family company, Deja II, in this District for their role in the Tax-Credit theft as well as a separate fraud. *See CWT Canada II Ltd. Partnership, et al. v. Danzik, et al.*, Case No. 16-cv-607-DGC (the "First Arizona Action").

46.    On July 29, 2016, the CWT Parties sued Carrigan and Kevin Bridges, both RDX board members (the latter of whom was later dismissed from this action), in this District for their role in the Tax-Credit theft. *See CWT Canada II Ltd. Partnership, et al. v. Bridges, et al.*, Case No. 16-cv-2577-DGC (the "Second Arizona Action"). And on September 12, 2016, the CWT Parties amended their complaint in this action to add DAS and Bridges's and Carrigan's spouses as defendants in this action.

47.    On March 31, 2017, Danzik and RDX sued, among others, the CWT Parties in this District for a fraud they claimed the CWT Parties committed in the sale of CWT to RDX. *Danzik, et al. v. CWT Canada II Ltd. Partnership, et al.*, Case No. 17-cv-969-DGC (the "Third Arizona Action").

48.    On May 22, 2017, the CWT Parties amended their complaint in the Second Arizona Action to add Ker and his wife as defendants.

49.    On September 27, 2017, the court consolidated the Second and Third Arizona Actions with and into the First Arizona Action (the "Consolidated Arizona Action").

50.    On January 26, 2018, the court in the Consolidated Arizona Action dismissed Dennis and RDX's claims asserted in the Third Arizona Action, leaving only the CWT Parties' affirmative claims and a defamation counterclaim by Ker (which was later also dismissed).

51.     Trial on the CWT Parties' claims in the Consolidated Arizona Action was scheduled to begin on April 20, 2020.

**E.      Wells Fargo Files the Interpleader Action**

52.     On October 18, 2017, in an effort to enforce their judgment against Danzik and RDX, the CWT Parties served a restraining notice on Wells Fargo Bank, N.A. to restrain funds nominally held in an account maintained by Wyo Tech, but in which the CWT Parties believed Danzik had an interest.

53.     On November 9, 2017, Wells Fargo filed the Interpleader Action in this District against Wyo Tech and the CWT Parties.

54.     On August 1, 2018, the court granted Wells Fargo's motion, to which Wyo Tech consented, to interplead the funds the CWT Parties restrained with the court.

55.     On August 17, 2018, Wells Fargo deposited these funds, totaling $596,190.83, with the Clerk of Court.

56.     Throughout the course of the Interpleader Action, Wyo Tech, its investors, and its counsel repeatedly refused to cooperate in discovery, resulting in orders by Judge Lanza holding several of Wyo Tech's investors in civil contempt and sanctioning and awarding attorneys' fees against Wyo Tech and its counsel for their failure to comply with subpoenas and court orders.

57.     On November 20, 2019, the parties agreed to stay all deadlines in the Interpleader Action to allow a global mediation concerning this and the other actions listed above and below to take place. This stay remains in place pending the submission of a stipulation of substitution or joint status report on April 24, 2020.

**F.**     **RRC Sues Inductance and Wyo Tech for Fraudulent Transfer**

58.     During discovery in the Interpleader Action, the CWT Parties learned that, just days after the New York court entered the judgment against him in September 2016, Danzik transferred valuable intellectual property to Wyo Tech for no consideration.

59.     Though Danzik and Wyo Tech purported to assign a "zero" value to this intellectual property when it was transferred, Wyo Tech has since claimed that it is worth $100 million and has raised at least $16 million from investors on the strength of this intellectual property—which the *Wall Street Journal* recently described as a technological breakthrough that previously "eluded great minds from Leonardo da Vinci to electrical pioneer Nikola Tesla," and as a discovery that "would rank with the harnessing of steam, electricity, and the atom."

60.     On September 23, 2019, RRC filed the Fraudulent-Transfer Action in this District again Wyo Tech and Inductance, alleging that Danzik transferred valuable intellectual property to Wyo Tech for no consideration, and that Wyo Tech then leased this intellectual property to Inductance. RRC also alleged, alternatively, that this intellectual property belonged to RDX or DAS, and was fraudulently transferred by them.

61.     On September 25, 2019, the CWT Parties moved to have the Fraudulent-Transfer Action transferred to Judge Lanza as related to the Interpleader Action.

62.     On November 20, 2019, the parties agreed to stay all deadlines in the Fraudulent-Transfer Action to allow a global mediation concerning this and the other actions listed above to take place. This stay remains in place pending the submission of a stipulation of substitution or joint status report on April 24, 2020. The CWT Parties' motion to transfer also remains pending.

**G.    Hinz Desperately Seeks to Reach a Global Settlement, and Takes the Lead in Settlement Negotiations With the CWT Parties and RRC**

63.    Though Hinz was not personally a party to any pending litigation with the CWT Parties, as explained above, upon information and belief, he is the CEO of and a substantial investor in Wyo Tech and Inductance, and thus has a significant personal and financial interest in their success. Indeed, in an interview he gave last year about Inductance, Hinz told the *Wall Street Journal* that he "wouldn't sell this company for a billion dollars." And so Hinz had a lot to gain from Wyo Tech's and Inductance's success, and a lot to lose if RRC were successful in the Fraudulent-Transfer Action—which could expose Wyo Tech and Inductance to liability for the full value of the judgment against Danzik.

64.    Moreover, e-mails produced by Wyo Tech and Inductance investors in the Interpleader Action show that several prominent investors have engaged in power struggles with Hinz for control over and influence in Inductance and Wyo Tech. Indeed, some investors have become disillusioned with Danzik and have challenged Hinz's leadership and support of him—including Hinz's and his chosen counsel's litigation decisions in the Interpleader Action. And according to one internal Wyo Tech-Inductance e-mail, one prominent investor even complained that Wyo Tech's counsel in the Interpleader Action was "ineffective" compared to the CWT Parties' "formidable New York attorney," and that Wyo Tech, under Hinz's leadership, should "hire an experienced competent counsel."

65.    Thus, in an effort to protect Wyo Tech and Inductance and his own control over these companies, and based on his support of and belief in Danzik, Hinz—either personally or through Wyo Tech, Inductance, or other companies he owns or controls—has been paying the legal fees for Danzik, Danzik's wife, DAS, RDX, Carrigan, Ker, Wyo Tech, and Inductance in the pending litigations between the parties. This includes pending

motion practice in the New York Action; several federal cases pending in this District—including the Consolidated Arizona Action, which was scheduled to be tried in April 2020; and upon information and belief, the Canadian Action.

66.    Indeed, we first learned that Hinz or his companies were paying Danzik's and his cronies' legal fees in late 2017 when Danzik's then-counsel, Wilenchik & Bartness, P.C., produced a check from Wyo Tech to it in response to a subpoena seeking documents showing who paid Danzik's legal fees.

67.    Then, in his deposition in the Consolidated Arizona Action on January 12, 2018, Danzik testified that "[r]ight now, Mr. Hinz is paying the vast majority of our legal bills." And when asked by the CWT Parties' counsel why Hinz was paying his legal bills, Danzik responded: "Because you pissed him off."

68.    Further, discovery from the CWT Parties' judgment-enforcement efforts and in the Interpleader Action have shown that Inductance and Wyo Tech, and other companies controlled by Hinz, have paid hundreds of thousands of dollars in legal fees for Danzik and his cronies. And upon information and belief, the amount that Hinz, Wyo Tech, Inductance, and other companies that Hinz controls have paid in legal fees for Danzik and his cronies exceeds $1 million.

69.    Hinz and his companies' funding of all this litigation was functionally an investment in Danzik and the value Hinz believed he could provide to Wyo Tech and Inductance, and for Hinz personally. But this investment was growing greater and greater every month, as the CWT Parties aggressively pursued discovery in the Interpleader Action, RRC filed the Fraudulent-Transfer Action, and the Consolidated Arizona Action was about to go to trial. So both to limit further expense and the overall amount of his investment in Danzik, and to solidify his own control over Wyo Tech and Inductance, Hinz desperately sought to settle all outstanding litigation with the CWT Parties and RRC.

70.    Indeed, in an August 1, 2019 e-mail, Leos Beus, whose firm represented most of the Defendants here in other pending lawsuits in Arizona, told the CWT Parties' counsel by e-mail that Hinz was the ***"only source of money"*** for a settlement.

71.    And in this same e-mail, Mr. Beus further implored the CWT Parties to stop aggressively litigating the Interpleader Action, writing: "[I]f you wish me to attempt ***to get Bill Hinz to put up some money***, you should understand you need to stop the bologna that's going on with the contempts and the production and the $600,000 claim in order to get this done. It may not be possible, but you should understand the ***only source of money is Bill Hinz or his investors***."

72.    Mr. Beus then concluded: "[I]f you want me to see if I can get some reasonable amount of money somewhere ***in the $1-1.5 million range from Bill Hinz for a total global settlement***, I will do it. If you think that's a total waste of my time, I don't want to waste my time and we can get on with our litigation." A copy of this e-mail is attached as Exhibit A.

73.    While settlement discussions stalled for a few months, in November 2019, Hinz began engaging directly with one of the CWT Parties' principals, Jean Noelting. Indeed, in the first settlement conversation he had with Mr. Noelting on November 19, 2019, Hinz immediately proposed an in-person settlement conference or mediation in Arizona to try to reach a global settlement of all outstanding disputes.

74.    On November 27, 2019, following up on their call, Hinz wrote to Mr. Noelting: ***"I am committed to getting this all behind us,"*** and ***"I just want to stop paying attorneys and focus on helping our shareholders and work with you on a settlement."*** A copy of this e-mail is attached as Exhibit B.

75.    On November 29, 2019, Hinz followed up with Mr. Noelting again, sending a list of several issues that he proposed the parties resolve before the mediation. In this e-

mail, Hinz said that he would "pay for the mediator and space rental." And at the end of this e-mail, Hinz wrote: ***"Jean, I think we are very close on this matter and we need to give ourselves reasonable time to get this right and so it will be acceptable in Canada."*** A copy of this e-mail is attached as Exhibit C.

76.     On December 4, 2019, Hinz again reached out to Mr. Noelting, emphasizing his desire to minimize the legal expenses that he or his companies were paying for Danzik and Defendants, and stating: ***"Frankly I do not want to waste more money or time on this issue, as I am sure it's the same for you."***

77.     And concerning a miscommunication regarding when the mediation would occur, Hinz further wrote: "Jean, this change of dates is totally my fault and I can only ask you to agree in the spirit of getting this behind us once and for all. Please allow us to get through the holiday season and do this correctly. A few more weeks is, in my mind, a small inconvenience to end all this litigation. God knows the only ones benefitting are the attorneys." A copy of this e-mail is attached as Exhibit D.

78.     Later on December 4, 2019, Hinz again wrote to Mr. Noelting about the importance of reaching a settlement, stating: "I think that you and I need to come to an important agreement to move forward, and that is that we will not keep stating legal case points in emails." A copy of this e-mail is attached as Exhibit E.

79.     On January 8, 2020, Hinz again wrote to Mr. Noelting concerning the upcoming mediation, which was scheduled for mid-January, stating: "I believe everything is set and I hope, as do you, everything can go without incident. ***Both of us have more important things to do with our time. I look forward to an intelligent exchange of ideas to move forward.***" A copy of this e-mail is attached as Exhibit F.

80.     On January 14, 2020, after the CWT Parties' raised a concern that Danzik had, without warning, filed another bankruptcy on the eve of the mediation, Hinz assured

Mr. Noelting that Danzik's bankruptcy would not interfere with any payments made in accordance with a settlement the parties reached, writing: ***"Regardless we will ensure the money flows the right way as well. I don't anything [sic] to slow this process, so I will do what's necessary."*** A copy of this e-mail is attached as Exhibit G.

**H.    The Parties Hold a Mediation Before Judge Schneider and Enter Into the Term Sheet**

81.    On January 16, 2020, the parties held a mediation in Phoenix, Arizona before the Honorable Barry C. Schneider. The following people physically attended and participated in the mediation: Jean Noelting and Bruce MacFarlane, the CWT Parties' and RRC's principals; Jeffrey M. Eilender, the CWT Parties' and RRC's counsel; Hinz; Ker; and David A. Timchak, whom, at all times before and during the mediation, the CWT Parties and RRC understood represented or spoke for Inductance, Wyo Tech, and Hinz. Joshua Wurtzel, the CWT Parties' and RRC's counsel, also participated in approximately the last hour of the mediation by telephone. Further, upon information and belief, throughout the mediation, Hinz, Ker, or Timchak regularly conferred with Danzik by telephone. The mediation took place at the office of Fennemore Craig, Mr. Timchak's firm.

82.    Defendants have since claimed that Mr. Timchak represented only Inductance at the mediation, and that the CWT Parties insisted that the other Defendants' counsel at Wilenchik & Bartness not participate. But this is false. Indeed, in the months leading up to the mediation, Hinz repeatedly referred to Mr. Timchak as ***his*** attorney for purposes of the mediation.

83.    For example, on November 27, 2019, Hinz e-mailed Mr. Noelting about limiting the participants of the mediation to prevent distractions, but stated that "[i]ts fine to have an attorney in the meetings, ***I will as well*** . . . ." Ex. B.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

84.     And on November 29, 2019, Hinz confirmed that Mr. Timchak was his attorney, writing to Mr. Noelting: "***My attorney, David Timchak*** is on his honeymoon and I cannot get him involved until December 9th. But when I do, I will get David on board full time to get this work done."

85.     Moreover, that Wilenchik & Bartness did not participate in the mediation was ***Hinz's*** decision, not the CWT Parties'. Indeed, in his November 29 e-mail, Hinz wrote to Mr. Noelting: ***"I prefer that we keep it to one attorney each side,"*** and ***"[o]n my side it will be David Timchak from Fennemore Craig."*** Ex. C.

86.     Further, Mr. Timchak submitted a mediation statement to Judge Schneider on behalf of all the Defendants, and the mediation statement noted that attorneys from Wilenchik & Bartness assisted in its preparation.

87.     Thus, the CWT Parties never prevented or dissuaded any of the Defendants from bringing additional counsel of their choosing to the mediation. And critically, this e-mail exchange confirms that Hinz held himself out to Mr. Noelting as the person in charge of his "side" and that he was personally represented by all the counsel he deemed necessary. This also confirms the CWT Parties' understanding that they were primarily dealing with Hinz—the person whom Mr. Beus previously said was the ***"only source"*** of any money—to reach a settlement.

88.     Dealing directly with Hinz was crucial to the CWT Parties and RRC, since most of the other Defendants had represented at one time or another that they did not have any significant assets, and Wyo Tech and Inductance were controlled by Hinz. Indeed, the CWT Parties and RRC understood from Defendants and their counsel that Hinz had the money to pay a settlement, and had been and would continue to be paying for all their litigation expenses in all the cases (including in Canada, where RDX was using one of the largest law firms in that country). The CWT Parties and RRC also understood from

Defendants and their counsel that Hinz would be funding any settlement, because he wanted his own bleeding to stop, and also wanted his companies, Inductance and Wyo Tech, to get on with their business—which the CWT Parties and RRC were threatening in the Interpleader Action and (especially) in the Fraudulent-Transfer Action. Thus, the CWT Parties and RRC's sole motivation for attending the mediation in January 2020 was to persuade Hinz to pay them—either directly or through his companies. Otherwise, there would be no point to any settlement with the other parties, most of which claimed to be judgment proof.

89.     The mediation lasted a full day, and the negotiations centered around how much Hinz's "side" would pay to the CWT Parties, when the payment would be made, and what would have to happen before the payment were made.

90.     With Judge Schneider's assistance, by the end of the day, the parties reached an agreement on all material terms, and decided to memorialize their agreement in the Term Sheet. Mr. Timchak himself drafted the Term Sheet on his laptop and then showed it to Hinz and Ker, Messrs. Noelting and MacFarlane, and Mr. Eilender for their review. Mr. Wurtzel was also participating in this part of the mediation by phone, and Mr. Timchak e-mailed him a copy of the Term Sheet for his review.

91.     After several rounds of edits, the parties all agreed on the final Term Sheet, which, among other things, provided:

- "The CWT Parties will assign all creditor claims/potential claims they have or may have against Dennis Danzik to William Hinz (or his designee)."[3]

---

[3] The Term Sheet defined the CWT Parties to include CWT Canada II Limited Partnership, Resource Recovery Corporation (the Delaware corporation), Resource Recovery Corporation (the New York corporation, which is the Plaintiff in this action), and Mr. Noelting.

- "The CWT Parties will assign the approximately $17,000,000.00 note held against RDX to William Hinz (or his designee)."
- "The CWT Parties will not oppose and will provide reasonable assistance to vacate contempt against Dennis Danzik in New York case."
- "The CWT Parties agree that they will not pursue or otherwise support the fraudulent transfer claim."
- Return of the CWT Parties' RDX stock.
- "Payment of two-million-five-hundred-thousand ($2,500,000.00) to CWT Parties' counsel due sixty (60) days after the signing of the final settlement agreement."
- "[T]he CWT Parties will provide reasonable assistance in efforts to settle with GEM," a separate party that had a significant judgment against Danzik and RDX, "but such settlement is not a condition to this term sheet or the final settlement agreement."
- Mutual releases for, among others, RDX, Inductance, Wyo Tech, Hinz, Carrigan, Ker, Danzik's wife, DAS, the CWT Parties, RRC, and Mr. MacFarlane.
- Dismissals with prejudice of the Consolidated Arizona Action and the Canadian Action.
- Stipulations of substitution for the CWT Parties in the Interpleader Action and for RRC in the Fraudulent-Transfer Action and the New York Action.

A copy of the Term Sheet is attached as Exhibit H.

92.     In the Term Sheet, the parties contemplated executing a "final settlement agreement" and "other documentation/filings as required and agreed between them" that "incorporated" the terms in the Term Sheet. But critically, the parties all agreed that the

Term Sheet was binding on its own without any further agreement, including in the Term Sheet: ***"By signing this document, the parties agree to be bound by the terms set forth herein."*** Mr. Timchak drafted this language, and after reviewing it, Judge Schneider agreed that the Term Sheet should be binding on its own.

93.     Mr. Timchak also drafted the signature lines for all the parties, and the parties then signed the final Term Sheet. Mr. Timchak signed for Inductance, and Hinz then signed for both Wyo Tech and for himself personally. Ker signed for himself, RDX, and Carrigan. Upon information and belief, Ker had actual authority to sign for RDX and Carrigan. And in the three months since the Term Sheet was executed, RDX and Carrigan's counsel at Wilenchik & Bartness—which has reviewed the term sheet and sent the CWT Parties' and RRC's several letters and e-mails about it—has never claimed that Ker lacked authority to sign for RDX or Carrigan. Indeed, as explained below, Carrigan even ratified the Term Sheet by accepting the benefits of it in the form of the CWT Parties' dismissal of their claims against him in the Consolidated Arizona Action with prejudice.

94.     While Hinz has since claimed that he did not intend to bind himself personally, by signing once for Wyo Tech and once on a signature line above his name, with no notation that he was signing a second time in a representative capacity, Hinz manifested an objective intent to be bound by the Term Sheet personally. There was no other reason for him to sign twice, and Mr. Timchak was the one who prepared the signature lines in any event—which was in the first draft of the Term Sheet and not the result of any edits from the CWT Parties, RRC, or their counsel. Further, Hinz's agreement to be personally bound by the terms in the Term Sheet was consistent with Mr. Beus's previous representations that any settlement payment would come from Hinz or companies he controlled.

95.     Further, as explained above, under the Term Sheet, Hinz personally or a designee of his choice was to receive a $17 million note, a judgment worth over $9 million, and a release. And Wyo Tech and Inductance were also getting releases and the CWT Parties' and RRC's discontinuance of the claims in the Interpleader Action and Fraudulent-Transfer Action; and given that Hinz was the CEO and a significant investor in Wyo Tech and Inductance, he was personally benefitting from these terms as well. Thus, of everyone who signed the Term Sheet, Hinz *personally* received the most valuable consideration.

96.     On January 24, 2020, the CWT Parties and Wyo Tech filed a joint status report in the Interpleader Action, stating that, during the mediation, they "entered into a *binding* term sheet." A copy of this status report is attached as Exhibit I.

97.     Also on January 24, RRC, Wyo Tech, and Inductance filed a similar status report in the Fraudulent-Transfer Action, also acknowledging that during the January 16 mediation before Judge Schneider, they entered into a "*binding* term sheet." A copy of this status report is attached as Exhibit J.

98.     Further, in an e-mail he sent Mr. Noelting on February 21, 2020, Hinz stated that the "term sheet was *signed by us all*," and *"we"* are *"legally obligated to execute."* A copy of this e-mail is attached as Exhibit K.

99.     Thus, Hinz, Wyo Tech, and Inductance all understood that the Term Sheet was a binding agreement, and that they were all obligated to perform under it.

**I.     Defendants Ratify the Term Sheet**

100.    As explained below, contrary to their representations to the courts in the Interpleader and Fraudulent-Transfer Actions, and contrary to Hinz's own admission to Mr. Noelting, Defendants have since taken the position that the Term Sheet is not binding

or enforceable against them. But this position is inconsistent with Defendants' acceptance of the benefits of the Term Sheet.

101.   Indeed, on February 28, 2020, the CWT Parties and Ker, Carrigan, DAS, and Danzik's wife entered into and filed a stipulation in the Consolidated Arizona Action dismissing all the CWT Parties' claims in that action with prejudice—which the court granted on March 4, 2020. A copy of this stipulation and the court's order granting it are attached as Exhibit L.

102.   The CWT Parties' claims in the Consolidated Arizona Action cannot be revived. And the CWT Parties agreed to dismiss them with prejudice solely because they were obligated to do so under the Term Sheet. Defendants did not object to the dismissal of the Consolidated Arizona Action; to the contrary, they accepted this benefit in accordance with the Term Sheet.

103.   Further, over the last month, also in accordance with the Term Sheet, Messrs. Noelting and MacFarlane have had several calls and e-mails with Hinz and Ker to assist Defendants in their efforts to settle with GEM. Hinz and Ker accepted this assistance without reservation.

104.   Thus, having agreed in the Term Sheet that the Term Sheet would be binding, representing to this Court and to Mr. Noelting that the Term Sheet was binding, and accepting some of the benefits of the Term Sheet, Defendants ratified the Term Sheet and cannot now claim that it is not binding.

**J.     The CWT Parties Perform Their Obligations, But Defendants Refuse to Perform Under, and Thus Breach, the Term Sheet**

105.   Between January and March 2020, the CWT Parties and RRC continued to demand that Defendants enter into a more formal settlement agreement consistently with the Terms of the Term Sheet.

106.   But Defendants refused to do so—agreeing to sign a follow-up agreement only if that agreement altered several material terms of the Term Sheet. Specifically, despite signing—and thus agreeing to be bound by all the terms of—the Term Sheet, Inductance, Wyo Tech, and Hinz disclaimed the $2.5 million payment term, as well as other material terms in the Term Sheet. And so Defendants refused to sign a follow-up agreement that is consistent with—rather than a modification of—the Term Sheet, and also refused to comply with their obligations under the Term Sheet—which is binding on its own.

107.   After it became clear that Defendants would not enter into a follow-up agreement consistently with the Term Sheet, on March 16, 2020, the CWT Parties' and RRC's counsel sent demand letters for payment of the $2.5 million to Defendants' counsel, and included wire-transfer information. Copies of these demand letters are attached as Exhibit M.

108.   Also on March 16, in accordance with the Term Sheet, the CWT Parties' and RRC's counsel sent Defendants' counsel an executed (a) stipulation of substitution in the Fraudulent-Transfer Action, (b) stipulation of substitution in the Interpleader Action, (c) assignment of the RDX promissory note, (d) assignment of the judgment against Danzik, and (e) release agreement. Copies of these executed documents, along with the e-mails transmitting them, are attached as Exhibit N.

109.   Also on March 16, in accordance with the Term Sheet, the CWT Parties' and RRC's counsel confirmed that the CWT Parties' RDX stock was held in escrow pending payment of the $2.5 million payment, and that the CWT Parties and RRC remained available to provide "reasonable assistance" in Danzik and RDX's efforts to settle with GEM. A copy of this e-mail is attached as Exhibit O.

110.   Further, on April 10, 2010, also in accordance with the Term Sheet, the CWT Parties' and RRC's counsel sent Defendants' counsel a stipulation of substitution in the New York Action. A copy of this stipulation, with the e-mail transmitting it, is attached as Exhibit P.

111.   Apparently taking the erroneous position that the Term Sheet is not binding, neither Defendants' nor their counsel have countersigned any of these stipulations or assignments, and so they have not been filed. Nor have Defendants made the $2.5 million payment to the CWT Parties' or RRC's counsel required by the Term Sheet. Nor have Defendants executed releases in favor of the CWT Parties or RRC. Nor has RDX dismissed the Canadian Action with prejudice (which, if not immediately dismissed, will result in additional legal expenses to the CWT Parties).

112.   In contrast, the CWT Parties and RRC have done everything required of them under the Term Sheet, and their performance under the Term Sheet is complete.

**FIRST CAUSE OF ACTION**
**(Breach of Contract Against Inductance,**
**Wyo Tech, RDX, Hinz, Ker, and Carrigan)**

113.   RRC repeats the allegations above as if fully set forth again.

114.   The Term Sheet is a valid and binding contract between RRC and the CWT Parties, on the one hand, and Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan, on the other hand.

115.   In the Term Sheet, among other things, each of Inductance, Wyo Tech, RDX, Hinz, Ker and Carrigan agreed to be liable for the $2.5 million payment on a joint and several basis.

116.   The mutual exchange of promises in the Term Sheet was sufficient consideration.

117.    RRC and the CWT Parties fully performed all their material obligations under the Term Sheet, including by, as explained above, executing a stipulation of dismissal with prejudice in the Consolidated Arizona Action, a stipulation of substitution in the Fraudulent-Transfer Action, a stipulation of substitution in the Interpleader Action, a stipulation of substitution in the New York Action, an assignment of the RDX promissory note, an assignment of the judgment against Danzik, and a release agreement; by confirming that their RDX stock is being held in escrow pending receipt of the $2.5 million payment; and by providing reasonable assistance, and confirming their continued willingness to continue providing this assistance, to Defendants in their efforts to settle with GEM.

118.    Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan have failed to perform their obligation under the Term Sheet to pay $2.5 million to the CWT Parties' and RRC's counsel, and have refused to accept the performance the CWT Parties obligations or have otherwise prevented the CWT Parties and RRC from performing.

119.    While the Term Sheet stated that this payment would be made within 60 days of the signing of a "final settlement agreement," the execution of a "final settlement agreement" was *not* a condition precedent to this payment. To the contrary, this term merely related to the timing and mechanics of the payment. Since no "final settlement agreement" after the Term Sheet was signed, the time within which Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan were required to make this $2.5 million payment was a reasonable time. Since three months have passed since the Term Sheet was executed and Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan have refused to perform under the Term Sheet, a reasonable time has already passed, and the failure of Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan to make the $2.5 million payment is a breach of the Term Sheet. Indeed, nothing except Defendants' own actions has

prevented them from making this payment. And since almost twice the allotted time of 60 days has passed since the Term Sheet was signed, a reasonable time has already passed.

120.   Hinz's, Ker's, and Carrigan's execution of, and agreement to be personally bound by, the Term Sheet was a direct agreement by each of them to be bound by the Term Sheet in exchange for the consideration they each received. It was not a guaranty, indemnity, or suretyship, and thus their respective community property is all bound even though their respective spouses did not sign the Term Sheet.

121.   As result of the breach of the Term Sheet by Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan, RRC suffered damages in an amount to be determined at trial, but no less than $2.5 million; plus, under A.R.S. §§ 12-341 and 12-341.01, its attorneys' fees and disbursements incurred in bringing this action; plus pre- and post-judgment interest—for which each of Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan is jointly and severally liable.

122.   This Court should also award a permanent injunction to RRC directing Defendants to specifically perform their obligations under the Term Sheet, including executing the releases, stipulations, and assignments attached as exhibits to this Complaint and dismissing the Canadian Action with prejudice.

**SECOND CAUSE OF ACTION**
**(Alternatively, Breach of the Covenant of Good**
**Faith and Fair Dealing Against Inductance,**
**Wyo Tech, RDX, Hinz, Ker, and Carrigan)**

123.   RRC repeats the allegations above as if fully set forth again.

124.   RRC pleads this claim solely in the alternative to the first cause of action for breach of contract.

125. The Term Sheet is a valid and binding contract between RRC and the CWT Parties, on the one hand, and Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan, on the other hand.

126. In the Term Sheet, among other things, each of Inductance, Wyo Tech, RDX, Hinz, Ker and Carrigan agreed to be liable for the $2.5 million payment on a joint and several basis.

127. The mutual exchange of promises in the Term Sheet was sufficient consideration.

128. The Term Sheet contained the implied covenant of good faith and fair dealing.

129. RRC and the CWT Parties fully performed all their material obligations under the Term Sheet, including by, as explained above, executing a stipulation of dismissal with prejudice in the Consolidated Arizona Action, a stipulation of substitution in the Fraudulent-Transfer Action, a stipulation of substitution in the Interpleader Action, a stipulation of substitution in the New York Action, an assignment of the RDX promissory note, an assignment of the judgment against Danzik, and a release agreement; by confirming that their RDX stock is being held in escrow pending receipt of the $2.5 million payment; and by providing reasonable assistance, and confirming their continued willingness to continue providing this assistance, to Defendants in their efforts to settle with GEM.

130. Under the Term Sheet, Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan were required to execute a "final settlement agreement" that "incorporated" the terms of the Term Sheet, including the requirement that all of Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan would be liable for the $2.5 million payment to RRC's counsel.

131. By refusing to enter into a "final settlement agreement" that properly "incorporated" the terms of the Term Sheet, Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan impaired the rights of RRC to receive the benefits that flowed from the Term Sheet, and destroyed RRC's right to receive the fruits of the Term Sheet.

132. Hinz's, Ker's, and Carrigan's execution of, and agreement to be personally bound by, the Term Sheet was a direct agreement by each of them to be bound by the Term Sheet in exchange for the consideration they each received. It was not a guaranty, indemnity, or suretyship, and thus their respective community property is all bound even though their respective spouses did not sign the Term Sheet.

133. As result of the breach of the covenant of good faith and fair dealing contained in the Term Sheet by Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan, RRC suffered damages in an amount to be determined at trial, but no less than $2.5 million; plus, under A.R.S. §§ 12-341 and 12-341.01, its attorneys' fees and disbursements incurred in bringing this action; plus pre- and post-judgment interest—for which each of Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan is jointly and severally liable.

134. This Court should also award a permanent injunction to RRC directing Defendants to specifically perform their obligations under the Term Sheet, including executing the releases, stipulations, and assignments attached as exhibits to this Complaint and dismissing the Canadian Action with prejudice.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment Against Inductance,**
**Wyo Tech, RDX, Hinz, Ker, and Carrigan)**

135. RRC repeats the allegations above as if fully set forth again.

136.    The Term Sheet is a valid and binding contract between RRC and the CWT Parties, on the one hand, and Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan, on the other hand.

137.    There is a dispute concerning the enforceability of the Term Sheet.

138.    This is a justiciable dispute.

139.    Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan have refused to execute the releases in favor of RRC and the CWT Parties as required by the Term Sheet.

140.    RDX has refused to dismiss with prejudice the Canadian Action as required by the Term Sheet.

141.    RRC has no adequate remedy at law.

142.    The equities are balanced in RRC's favor.

143.    Though this Court does not have authority to order the dismissal of the Canadian Action, this Court may, and should, issue a declaratory judgment that the Term Sheet is a valid and binding contract, and that Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan are jointly and severally for any damages that RRC or the CWT Parties incur—including attorneys' fees and disbursements, and liability for a judgment—as a result of Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan's refusal to execute these releases or dismiss the Canadian Action with prejudice.

144.    Under A.R.S. §§ 12-341 and 12-341.01, this Court should also award RRC its attorneys' fees and disbursements incurred in bringing this action

**WHEREFORE**, RRC respectfully requests that this Court enter judgment in its favor against Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan on all of its causes of action, awarding it damages in an amount to be determined at trial, but no less than $2.5 million; plus, under A.R.S. §§ 12-341 and 12-341.01, its attorneys' fees and disbursements incurred in bringing this action; plus pre- and post-judgment interest; plus

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

award a permanent injunction to RRC directing Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan to specifically perform their obligations under the Term Sheet, including executing the releases, stipulations, and assignments attached as exhibits to this Complaint and dismissing the Canadian Action with prejudice; plus enter a declaratory judgment that the Term Sheet is a valid and binding contract, and that Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan are jointly and severally for any damages that RRC or the CWT Parties incur—including attorneys' fees and disbursements, and liability for a judgment— as a result of Inductance, Wyo Tech, RDX, Hinz, Ker, and Carrigan's refusal to execute the releases required by, or dismiss the Canadian Action with prejudice in accordance with, the Term Sheet; and plus any other and further relief as may be just and proper.

1    Dated: April 20, 2020
2          Phoenix, Arizona

3

4                                  Respectfully submitted,

5                                  **RYAN RAPP & UNDERWOOD, P.L.C.**

6                                  By:     /s/ Henk Taylor (016321)
7                                            J. Henk Taylor (016321)
8                                            3200 North Central Avenue, Suite 1600
                                           Phoenix, Arizona 85012
9                                            Telephone: (602) 280-1000
                                           Facsimile: (602) 265-1495
10                                         E-Mail: htaylor@rrulaw.com

11                                  **SCHLAM STONE & DOLAN LLP**

12                                      Jeffrey M. Eilender *(pro hac vice to be*
13                                            *submitted)*
                                           Bradley J. Nash *(pro hac vice to be*
14                                            *submitted)*
15                                            Joshua Wurtzel *(pro hac vice to be*
                                           *submitted)*
16                                            26 Broadway
17                                            New York, New York 10004
                                           Telephone: (212) 344-5400
18                                            Facsimile: (212) 34407677
                                           E-Mail: jeilender@schlamstone.com
19                                            E-Mail: bnash@schlamstone.com
20                                            E-Mail: jwurtzel@schlamstone.com

21                                *Attorneys for Plaintiff Resource Recovery*
22                                *Corporation*

23

24

25

26

27

28